**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CALLIDUS CAPITAL CORPORATION,

        Plaintiff,

v.                                 Case No. 14-10484

FCA GROUP, f/k/a, CHRYSLER GROUP LLC,

        Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART CROSS
MOTIONS FOR SUMMARY JUDGMENT**

Both parties have filed motions for summary judgment, (Dkt. # 69, 71), as well

as supplemental briefing at the court's direction. (Dkt. # 76, 78.) The court having

reviewed full briefing on both motions, concludes a hearing is unnecessary. *See* E.D.

LR7.1(f)(2).  For the reasons discussed herein, the court will grant in part and deny in

part each motion for summary judgment.

## I. BACKGROUND

Harvey Industries, LLC and Harvey Industries Die Casting, LLC (collectively,

"Harvey") was an automotive parts supplier to Defendant FCA Group ("FCA"), formerly

known as Chrysler LLC. From 2011-2012 Harvey provided component parts to FCA

pursuant to certain purchase orders ("POs"). (Dkt. # 77-4.) In addition to the parts, and

pursuant to tooling purchase orders ("TPOs") issued by FCA, Harvey obtained the

tooling necessary to make the component parts. (Dkt. # 77-10.) The term "tooling" in the

automotive industry is used to refer to specific tools, dies, molds, and similar items that

are custom built and designed for use in the manufacture of specific production parts for specific customers. (Dkt. # 76, Pg. ID 2314.) The tooling at issue was expensive and required advance notice of orders to allow significant time to build it. (Dkt. # 76, Pg. ID 2315; Dkt. # 78, ID 3712.) Harvey purchased the materials for the tooling from third-party vendors. (*Id.*; *Id.* at 3713.) At the time, Harvey was the only supplier who possessed the tooling necessary to produce the parts FCA needed. (*Id.*; Dkt. # 78, Pg. ID 3713.) FCA alleges that under the POs, it was allowed to set off against Harvey's account, meaning that FCA could deduct any costs it incurred as a result of Harvey's failures to perform under the POs from the amount it owed Harvey under the account.

In August of 2012, FCA became aware that Harvey was struggling financially. (Dkt. # 76, Pg. ID 2315; *Id.* at 3714.) FCA was concerned that Harvey would not be able to produce parts on time or at all, which would cause FCA to be unable to produce its products on time. To address its financial problems, Harvey obtained financing from Plaintiff Callidus Capital Corporation ("Callidus") on November 7, 2012. (*Id.*; Dkt. # 78, Pg. ID 3715.) The financing agreement ("Loan Agreement") was for a loan of $46 million dollars, which included a $16 million dollar line of credit. (Dkt. # 75-4.) The line of credit was secured by a lien on Harvey's assets, including its accounts receivable present and future. Callidus perfected its lien by filing a UCC financing statement with the State of Michigan on November 9, 2012. (Dkt. # 75-5.) The Loan Agreement was set to expire on November 7, 2013, but on May 30, 2013, Callidus extended the agreement until December 31, 2013. (Dkt. # 78, Pg. ID 3733 n 1.)

## A. The Launch Assistance Agreement

Despite Callidus's loan, Harvey was not able to fulfill its part production commitments to FCA. In an effort to prevent a shutdown of FCA's production, FCA entered into a contract with Harvey on May 31, 2013 known as the Launch Assistance Agreement ("LAA"). (Dkt. # 77-2.) Under the LAA, FCA would assist Harvey in the production of the component parts by providing certain accommodations to Harvey from the effective date of the LAA, May 21, 2013, until one of three events occurred: (1) an event of default ("Event of Default") by Harvey; (2) completion of a successful transition of the part production as defined in the LAA; or (3) Dec. 31, 2013. (*Id.*) Certain written financial requests from Harvey to FCA are considered Events of Default under the LAA. (Dkt. # 77-2, Pg. ID 2405.) Among the accommodations FCA was to provide to Harvey was a loan, which "was subordinate to the Callidus loan and would be forgiven if Harvey met certain performance requirements." (Dkt. # 78, Pg. ID 3725.) Callidus alleges that FCA's damages or setoffs against Harvey that arose before the LAA were, pursuant to the LAA, subordinated to Callidus's loan. (Dkt. # 76, Pg. ID 2336.)

Four areas of the LAA are particularly relevant to the present dispute.

### 1. FCA's setoffs

First, the LAA contains provisions regarding FCA's ability to set off damages Prior to entering the LAA, FCA had substantial damages against Harvey for Harvey's nonperformance under the POs. FCA also indicated that its damages would continue to grow and new damages were likely to arise during the course of the LAA. FCA claimed it was entitled to set off its damages against the money FCA owed to Harvey known as

3

"the FCA receivables." (Dkt. # 76, Pg. ID 2320; Dkt. # 78, 3723.) The LAA limited FCA's ability to set off damages against the receivables. The extent of these limitations is disputed by the parties.

FCA argues the LAA prohibited it from setting off damages against accounts payable under the terms of the LAA and arising from the delivery of component parts owing as of the effective date of the LAA or during its Term. (Dkt. # 78, Pg. ID 3725.) In contrast, Callidus asserts that FCA was not permitted to set off any damages against the accounts of "the Term" of the LAA regardless of whether FCA deemed them "arisen" under the LAA.

### 2. Notice to Callidus

Second, the LAA identifies Callidus as a third-party beneficiary. (Dkt. # 77-2.) However, the LAA does not require Callidus to extend credit to Harvey or to forbear exercising its rights under its Loan Agreement with Harvey. The LAA requires FCA to give notice to Callidus before making any "Material Setoffs" or "Tooling Setoffs." (Dkt # 77-2, Pg. ID 2392-2395.) The LAA requires Harvey or FCA to give Callidus notice in the event Harvey agrees to let FCA resource production to alternative suppliers before the occurrence of an Event of Default, or if FCA obtains parts from alternative suppliers. (Dkt # 77-2, Pg. ID 2397.) However, the LAA does not require FCA to give Callidus notice of the occurrence of an Event of Default. (Dkt. # 77-2, Pg. ID 2405.)

### 3. Tooling Parts

Third, the LAA has various provisions governing the possession and ownership of the tooling Harvey ordered, had built, and used to produce FCA parts. Callidus

asserts that FCA "obtained the right to take physical possession of the tooling" under the LAA. (Dkt. # 76, Pg. ID 2319; Dkt. # 75-9, Pg. ID 2062.) In contrast, FCA asserts that it owned the tooling and had the right under the general terms of the POs to take possession of the tooling long before the LAA was executed. (Dkt. #78, Pg. ID 3712; Dkt. # 77-9, Pg. ID 2535.)

### 4. Resourcing

Fourth, the LAA prohibited FCA from resourcing production to alternative suppliers, absent an Event of a Default, during the Term of the LAA except upon written notice to Callidus. (Dkt. # 75-9, Pg. ID 2046.) However, the LAA allowed FCA to take actions to "prepare for a resourcing." *Id.* Resourcing is when a production company obtains an alternative supplier to provide the same parts as those being actively produced by its current supplier in an effort to transition the source of its parts from its current supplier to the alternative supplier, eventually discontinuing the relationship with the current supplier.

### B. The Alleged "Event of Default"

Harvey did not meet the performance requirements—Harvey shipped nonconforming parts, untimely parts, and eventually no parts at all. As a result, FCA expedited the shipping of the untimely parts to FCA production plants, ordered inspection and correction of nonconforming parts, and purchased alternative parts from European suppliers at higher costs. (Dkt. # 78, Pg. ID 3734.)

During this time, both parties were aware that Harvey was planning to move production of several of the parts from its plant at Aiken, South Carolina, to its plant in

Nuevo Laredo, Mexico. (Dkt. # 76, Pg. ID 2327.) In conjunction with a financial planner recruited by Callidus ("Farber Financial" a/k/a "Doeren Mayhew"), Harvey developed a plan for the transfer of production. The plan was known as "Project Spearhead." (Dkt. # 76, Pg. ID 2327; Dkt. # 78, Pg. ID 3735.)

On October 7, 2013, Harvey emailed to FCA a powerpoint presentation (the Presentation") regarding Project Spearhead. (Dkt. # 76, Pg. ID 2328; Dkt. # 78, Pg. ID 3739.) Throughout the Presentation there are references to obtaining funding from FCA for Project Spearhead. (Dkt. # 77-16, Pg. ID 2759-64.) The record also contains internal communications between Callidus, Farber Financial, and Harvey regarding their intentions to have FCA fund the Project. (Dkt. # 77-64, Pg. ID 3210; Dkt. # 77-17, Pg. ID 2766.) The Presentation includes a footnote "related to Harvey's proposal that [FCA] contribute certain funds to complete the transfer to Mexico." (Dkt. # 76, Pg. ID 2328; Dkt. # 77-16, Pg. ID 2764.) FCA considered this footnote to be a written financial request for FCA to help fund Project Spearhead. (Dkt. # 78, Pg. ID 3739.) FCA further concluded that said financial request constituted an Event of Default under the LAA and therefore, determined it was no longer bound by the setoff limitations of the LAA from October 7, 2013 onward. (Dkt. # 76, Pg. ID 2328.)

### C. FCA Cancels its POs to Harvey

For six weeks following the alleged Event of Default, FCA continued to accept and use parts Harvey produced. Callidus continued to finance Harvey. (Dkt. # 76, Pg. ID 2333.) At some point during this time period, FCA concluded that Project Spearhead was not feasible and that Harvey would not be successful under it. Accordingly, FCA

declined to agree to participate in the Project (Dkt. # 78, Pg. ID 3751), and on November 17, 2013, FCA cancelled its POs with Harvey. (Dkt. # 77-97; Dkt. # 76, Pg. ID 2335.)

FCA demanded that Harvey surrender the tooling established under the original POs. Harvey refused to surrender it. FCA recovered some of the tooling in April of 2014 and the remainder in April 2016. (Dkt. # 78, Pg. 3753) FCA alleges that it sustained additional damages due to Harvey's refusal to surrender the tooling. (*Id.*) Callidus counters that FCA was allegedly financing the construction of replacement tooling by alternate suppliers long before Harvey's alleged default under the LAA and therefore, cannot claim it as damages for breach of the LAA. (Dkt. # 76, Pg. ID 2335-36.)

On December 9, 2013, FCA informed Harvey and Callidus that it was not going to pay the outstanding receivables owed to Harvey because the debt was offset by the amount Harvey owed to FCA. (Dkt. # 76, Pg. ID 2333; Dkt. # 75-31.)

### D. Procedural History

In light of these events, Callidus was successful in an action for receivership over Harvey. (Dkt. # 77-40.) Ultimately the receivership resulted in a sale of Harvey's remaining assets to Callidus. (Dkt. 77-104.) Callidus then filed this action against FCA alleging claims for a declaratory judgment, breach of contract, promissory estoppel, and unjust enrichment. (Dkt. # 16.) Callidus seeks damages in the amount FCA owed Harvey for production parts and tooling and a declaration that FCA may not set off against this amount.

7

## II. STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F. 3d 493, 497 (6th Cir. 2003). The movant has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]hat burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Bennett v. City of Eastpointe*, 410 F. 3d 810, 817 (6th Cir. 2005) (internal quotation marks omitted).

The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F. 3d 906, 909 (6th Cir. 2004) (citation omitted). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). In evaluating a summary judgment motion, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial . . . credibility judgments and weighing of the evidence are prohibited." *Moran v. Al Basit LLC*, 788 F. 3d 201, 204 (6th Cir. 2015) (internal quotation marks and citations omitted).

## III. DISCUSSION

In simplistic terms, the parties' dispute centers on the fact that FCA owes Harvey

money for the parts Harvey produced. But FCA has incurred various damages due to Harvey's performance failures under the POs and the LAA. Whether and to what extent, FCA may set off its damages against the amount it owes to Harvey will in effect determine the amount, if any, Callidus will recoup on its loan to Harvey.

### A. Michigan Law

This case is before the court under its diversity jurisdiction. Plaintiff is a Canadian corporation. Defendant is a Michigan limited liability company. As such, the court will apply Michigan law in its review of Plaintiff's state law claims.

### 1. Contracts

In Michigan, "[a] party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co. v. Ahrens Const., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014). "A valid contract requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Bank of Am., NA v. First Am. Title Ins. Co.*, 878 N.W.2d 816, 830 (Mich. 2016). "[T]he damages recoverable for breach of contract are those that arise naturally from the breach or those that were in the contemplation of the parties at the time the contract was made." *Kewin v. Massachusetts Mut. Life Ins. Co.*, 295 N.W.2d 50, 52–53 (Mich. 1980); *see also Lawrence v. Will Darrah & Assocs., Inc.*, 516 N.W.2d 43, 48 (Mich. 1994).

When interpreting a contract, the court "is to give effect to the parties' intention at the time they entered into the contract." *Innovation Ventures v. Liquid Mfg.*, 885 N.W.2d

861, 870 (Mich. 2016) (quoting *Miller-Davis Co. v. Ahrens Const., Inc.*, 848 N.W.2d 95, 102 (Mich. 2014)). The court is to "determine the parties' intent by interpreting the language of the contract according to its plain and ordinary meaning." *Bank of Am., NA v. First Am. Title Ins. Co.*, 878 N.W.2d 816, 821 (Mich. 2016). This is the proper course because "the law presumes that the parties understand the import of a written contract and had the intention manifested by its terms." *Van Buren Charter Twp. v. Visteon Corp.*, 904 N.W.2d 192, 199 (Mich. Ct. App. 2017) (quoting *Zurich Ins. Co. v. CCR & Co.*, 576 N.W.2d 392 (Mich. Ct. App. 1997). The court is to "avoid an interpretation that would render any portion of the contract nugatory." *Miller-Davis Co.*, 848 N.W.2d at 102. To do so, the court should "give effect to every word or phrase as far as practicable." *Barton-Spencer v. Farm Bureau Life Ins. Co. of Michigan*, 892 N.W.2d 794, 798 (Mich. 2017) (quoting *Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447 (Mich. 2003).

"Absent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement." *Universal Underwriters Ins. Co. v. Kneeland*, 628 N.W.2d 491, 494 (Mich. 2001). "A provision is not ambiguous just because 'reasonable minds can differ regarding' the meaning of the provision." *People v. Gardner*, 753 N.W.2d 78, 85 (Mich. 2008) (quoting *Lansing Mayor v. Pub. Service Comm.*, 680 N.W.2d 840 (Mich. 2004). "A contractual term is ambiguous on its face only if it is equally susceptible to more than a single meaning." *Barton-Spencer*, 892 N.W.2d at 798. An unambiguous contract is to be enforced as written because it "reflects the parties' intent as a matter of law." *In re Egbert R. Smith Trust,* 745 N.W.2d 754 (Mich. 2008).

Additionally, Michigan has adopted by statute, in large part, the Uniform Commercial Code governing contracts for the sale of goods. Several provisions of the Michigan UCC are relevant to the parties' dispute and will be referenced as they become pertinent to the court's discussion.

## 2. Declaratory Judgment

Plaintiff requests a declaratory judgment that Defendant breached the parties' contract. The Declaratory Judgments Act allows this court "[i]n a case of actual controversy within its jurisdiction, … upon the filing of an appropriate pleading, [to] declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C.A. § 2201(a).

## 3. Unjust Enrichment

Under Michigan law, a claim for unjust enrichment is characterized as a claim for breach of a contract implied by law. "There are two kinds of implied contracts; one implied in fact and the other implied in law. The first does not exist, unless the minds of the parties meet, by reason of words or conduct. The second is quasi or constructive, and does not require a meeting of minds, but is imposed by fiction of law, to enable justice to be accomplished, even in [a] case [where] no contract was intended." *Cascaden v. Magryta*, 225 N.W. 511, 512 (Mich. 1929); see also *City of Detroit v. City of Highland Park*, 39 N.W.2d 325, 334 (Mich. 1949) (noting that implied in law contracts are also known as constructive or quasi contracts).

"Contracts implied in law are not true contracts, but instead are quasi-contracts implied by courts *when a party retains money* or benefits which in justice and equity belong to another." *PNC Bank, Nat. Ass'n v. Goyette Mech. Co.*, 88 F. Supp. 3d 775, 784 (E.D. Mich. 2015) (emphasis added) (applying Michigan law) (internal quotation and citation omitted). "'The essential elements of a quasi contractual obligation [one implied in law], upon which a recovery may be had, are the receipt of a benefit by a defendant from a plaintiff, which benefit it is inequitable that the defendant retain.'" *Moll v. Wayne Cty.*, 278–79, 50 N.W.2d 881, 883 (Mich. 1952) (quoting *Herrmann v. Gleason*, 126 F.2d 936, 940 (6th Cir. 1942) (overruled in part on other grounds by *Brown v. State, Dep't of Military Affairs*, 191 N.W.2d 347, 351 (Mich. 1971)). A finding of an implied contract in law is a remedy "under the equitable doctrine of unjust enrichment . . . with an implied obligation to pay for benefits received to ensure that exact justice is obtained." *Michigan Educ. Employees Mut. Ins. Co. v. Morris*, 596 N.W.2d 142, 151 (Mich. 1999) (internal citations and quotations omitted.) "Restitution may be imposed under the equitable theory of implied contract or quasi-contract to prevent the unjust enrichment of one party at the expense of another." *Hofmann v. Auto Club Ins. Ass'n*, 413 N.W.2d 455, 457 (Mich. App. 1987) (citing 66 Am Jur 2d, Restitution & Implied Contracts, §§ 1-3, pp 942-946).

### B. Plaintiff's Motion for Summary Judgment

Plaintiff asserts it is entitled to full or at least partial summary judgment for four reasons: (1) the LAA prohibits FCA from setting off its damages against the receivables it owes Harvey; (2) FCA failed to give the notice of breach required by Mich. Comp.

Laws § 440.2607 and therefore cannot claim any damages that arose before it later gave notice on November 17, 2013; (3) FCA cannot claim the cost of the replacement tooling it ordered as setoff damages; and (4) Callidus's security interest is superior to FCA's setoff rights.

## 1. FCA's ability to set off damages

Both parties agree that the LAA prohibits FCA from setting off any damages against "accounts payable to [Harvey] arising from the delivery of Component Parts owing as of the Effective Date and arising during the Term . . . ." (Dkt. # 75-9, Pg. ID 2043.) (the LAA goes on to list certain exceptions to this command including Allowed Setoffs, Material Setoffs and Tooling Setoffs.)  In other words, FCA can set off damages against only those accounts payable to Harvey arising after the Term concluded. Plaintiff asserts that FCA has improperly set off damages against the receivables it owes Harvey from the Term of the LAA. Defendant denies the allegation arguing that Plaintiff has incorrectly defined the Term of the LAA. The following provisions of the LAA referencing "the Term" are relevant to resolving the parties' dispute ("the Term" is emphasized throughout for convenience):

> [FCA] shall provide the following accommodations to [Harvey] from the Effective Date (unless otherwise specified herein) to the earliest of (i) the occurrence of an Event of Default by Supplier hereunder; (ii) completion of a Successful Transition (as defined below); or (iii) December 31, 2013 (**the "Term"**):

(Dkt. # 75-9. Pg. ID 2041-42.) The accommodations that FCA shall provide to Harvey are then listed, in relevant part, as:

> (a) <u>[FCA] Loan</u>. [FCA] asserts that, pursuant to the Purchase Orders, as of

13

Effective Date, [FCA] has the right to setoff its accounts owed to [Harvey] for the expenditures, damages and claims identified in Schedule 1.a (collectively, the "Claim Categories"). [FCA] further asserts that the expenditures, damages and claims identified in the Claim Categories will be ongoing and will increase during **the Term**. The amount of the expenditures, damages and claims in the Claim Categories claimed to have been incurred by [FCA] in the aggregate at any time prior to or during **the Term** is referred to herein collectively as the "Chrysler Claim").

. . .

No payments of principal or interest concerning the [FCA] Loan shall be due during **the Term** or payable at any time thereafter unless [Callidus] has received Payment in Full. The balance of the [FCA] Loan, including accrued interest, shall be due and, if [Callidus] has received Payment in Full, payable immediately upon termination of **the Term**, unless the [FCA] Loan is forgiven pursuant to subsection 1 (b).

. . .

(c) <u>Limitation of Setoffs</u>. For the sole and exclusive benefit of [Callidus], [FCA] shall pay all accounts payable to [Harvey] arising from the delivery of Component Parts owing as of the Effective Date and arising during **the Term** in accordance with the applicable Purchase Order terms and without setoff, recoupment or other deduction of any kind, except for, in each case, to the extent, on the terms and subject to the limitations, and as defined, below: (a) Allowed Setoffs, (b) Material Setoffs and (c) Tooling Setoffs. (*Id.* at 2043.)

. . .

(e) <u>Assistance</u>. During **the Term**, [FCA] shall identify qualified individuals to be retained at the Aiken Facility and the NL Facility (the "Independent Contractors"), to assist [Harvey] in day to day operations related to production of Component Parts, including building a bank of Component Parts, engineering issues related to Component Parts, tooling and quality issues, and the transition of production to the NL Facility. (*Id.* at 2045.)

. . .

(g) <u>Limitation on Resourcing</u>. Absent an Event of Default, at any time prior to the end of **the Term**, [FCA] will not resource production under the Purchase Orders to an alternative supplier(s), except, upon written notice to [Callidus], for (i) resourcing to which [Harvey] consents; and (ii) service parts.

(*Id.* at 2046.)

14

Events of Default are defined as,

> (a) During **the Term**, [Harvey] causes a material interruption in production of any Component Part.
>
> (b) [Harvey] terminates access and/or authority for any Independent Contractor, which termination or interruption [FCA] reasonably believes will affect the timely launch of the Transmission Parts.
>
> (c) [Harvey] requests in writing additional financial or operational accommodations not identified in this Agreement; excluding the Funding Request.
>
> (d) [Harvey] fails to perform under the terms of this Agreement.
>
> (e) During **the Term** [Harvey] directly causes a material breach of the Purchase Orders . . .
>
> (f) [Harvey] fails to meet a Milestone or there is a substantial likelihood that [Harvey] will not meet a Milestone and [Harvey] fails to timely deliver a Remediation Plan or [FCA] does not accept the Remediation Plan in its sole discretion . . .
>
> (g) [Callidus], or any other secured party takes any action against [Harvey] or its assets that would have a material adverse impact upon [Harvey]'s ability to perform under its contracts and agreements with [FCA].

(*Id.* at 2054-55.) The contract concludes with an additional obligation,

> 4. <u>Additional Accommodations</u>. Upon a Successful Transition, and as long as there has been no Event of Default, [FCA] shall permit [Harvery] to make competitive bids for the sourcing or transfer of new business . . . For clarity, the terms of this Agreement shall not apply to any purchase orders issued by [FCA] to [Harvey] relating to new business awarded to [Harvey] in [FCA]'s discretion after **the Term**.

(*Id.* at 2055.)

FCA contends that the Term ended on October 7, 2013 after Harvey committed

an Event of Default. Callidus argues that the Term continued until the set date in the

LAA—December 31, 2013. Whether the Term ended October 7 or December 31 is

important because FCA continued to issue POs to Harvey and accept parts from Harvey during the intervening six weeks, but alleges it incurred costs in doing so and acts properly in setting off those costs against the receivables owed to Harvey.

The correct interpretation of the parties' contract is a question of law that this court may properly resolve on a motion for summary judgment. *Shay v. Aldrich*, 790 N.W.2d 629, 635 (Mich. 2010). The provision defining "the Term" bears repeating; it states,

> [FCA] shall provide the following accommodations to [Harvey] from the Effective Date (unless otherwise specified herein) to the earliest of (i) the occurrence of an Event of Default by Supplier hereunder; (ii) completion of a Successful Transition (as defined below); or (iii) December 31, 2013 (the "Term"):

(Dkt. # 75-9. Pg. ID 2041-42.) This passage delineates the period during which FCA was required to provide Harvey accommodations. The court now considers whether "the Term" is shorthand for the period during which FCA was required to provide Harvey accommodations or whether it is a distinct period beginning May 21, 2013 (the effective date) and ending December 31, 2013 irrespective of the accommodations period. Under the former interpretation the parenthetical reference to the Term would relate to and modify the entire clause. Under the latter interpretation it would relate to and modify only the immediate "from the Effective Date . . . to the earliest of . . . (iii) December 31, 2013" clause.

### a. The provision defining "the Term"

Most significant, as will be explained, several textual clues related to the paragraph wherein "the Term" is first defined lean in favor of the set time period

16

interpretation advanced by Plaintiff. First, is the lack of punctuation between "December 31, 2013" and "("the Term")," indicating that the parenthetical refers to only its most immediate antecedent. If it were shorthand for the overall accommodation timeframe, there would be a period or a semi-colon following "December 31, 2013." *See* William Strunk, J. & E.B. White, *The Elements of Style* (3rd ed. 1979).

Second, the court notes the location of the definitional parenthetical. As Plaintiff aptly points out, the clause does not read, "The Term during which FCA shall provide the following accommodations to Harvey runs from  . . ." or "the Term means the period during which FCA shall . . . ." In the remainder of the agreement where the parties intended a specific expression to refer to any one of a list of various items or circumstances the parties structured the language of the LAA in a way similar to those examples. For instance,

> **"Material Setoffs" means** payments made by [FCA] to third-party vendors to purchase: (A) items, materials, services, or components to be used by [Harvey] in connection with the production of Component Parts, including any guaranty letters issued by [FCA] under which [FCA] is required to pay; or (B) materials, services, or components supplied to [Harvey] by [FCA] to be used by [Harvey] in connection with the production of Component Parts; provided, however, the foregoing shall not include items related to capital expenditures by [Harvey] as agreed by the Parties will be included within the Funding Request (as defined in Section 1(i)).

(Dkt. # 75-9, Pg. ID 2044) (emphasis added.) Throughout, the LAA structures the definitions of words that have complex *alternative* meanings in this manner. Consider another example,

> **"Inventory Trigger Event" means** the earliest to occur of the following events: (i) [FCA] resources some or all of its Component Part production

17

from [Harvey] (provided that resourcing by [FCA] of less than all of its business shall be deemed to be a Trigger Event only as to [FCA] Inventory related to the resourced Component Parts); (ii) the exercise by [FCA] of a right of access under the Access Agreement; or (iii) [Harvey] fails to meet the Milestone set forth under Section 2(d)(vii) and [Callidus] has ceased all obligations to fund [Harvey] and commenced its remedies under the Loan Agreement.

(Dkt. # 75-9, Pg. ID 2046) (emphasis added.) In contrast, in all of the provisions where the parties used a parenthetical containing a quoted expression within it, that expression is shorthand for the immediately preceding item. A few examples,

- the cost of the Independent Contractors added to the Chrysler Loan shall not exceed $500,000 (the "Cap") (*Id.* at 2045.)

- [Harvey] has requested that [FCA] loan [Harvey] the sum of $4,700,000 for use in the purchase of capital equipment and other items ("Cap Ex Expenditures") (*Id.* at 2048.)

- to deliver to [FCA] a remediation plan (the "Remediation Plan") to address the failed Milestone.(*Id.* 2050-52.)

- [Harvey] grants to [FCA] an irrevocable, fully paid option (the "Option") to purchase . . . (*Id.* at 2052.)

In the LAA, the Term is styled as a quoted parenthetical—("the Term"), not a quoted phrase that "means" one of a number of alternatives.

Third, and last, the parties used parenthetical phrases throughout the LAA to refer to or modify an immediately preceding antecedent. For example, note the parenthetical in the clause immediately before the December 31, 2013 date: "(ii) completion of a Successful Transition (as defined below)." (*Id.* at 2042.) The clarifying parenthetical "as defined below" immediately follows and refers to the term "Successful Transition," for which the LAA provides a definition in its later provisions.

18

Similarly, the LAA contains a provision whereby FCA will purchase all of Harvey's raw materials and finished goods inventory related to [FCA]'s Component Parts "from (i) [Callidus] (if [Callidus] obtains possession of and the right to sell such inventory by way of repossession, voluntary surrender, judicial intervention or otherwise), (ii) a trustee, receiver or interim receiver lawfully acting for the benefit of the [Callidus] ("Trustee"), or (iii) [Harvey], if [Callidus] so elects." (*Id.* at 2046.) The parenthetical beginning "if" alters the circumstances under which FCA may purchase the materials from Callidus. Each of these textual clues related to the paragraph wherein "the Term" is first defined weighs in support of Plaintiff's interpretation. The remainder of the LAA confirms this understanding.

### b. Other provisions in the LAA referencing "the Term"

**List of accommodations.** After defining the period during which FCA must provide accommodations to Harvey, the LAA lists and explains the accommodations to be provided. Some accommodations, but not others, clarify that the accomodation will occur "[d]uring the Term."  This language would be superfluous if the Term were shorthand only for the accommodations period. (*See* Dkt. # 75-9, Pg. ID 2042, 2045.)

The language pertaining to the resourcing accommodations is particularly enlightening. It states, "Absent an Event of Default, at any time prior to the end of the Term, [FCA] will not resource production under the Purchase Orders to an alternative supplier." *Id.* at 2046. Under FCA's reading, the accommodations period, and in turn the Term, ends upon the Event of a Default. In which case, the entire phrase "[a]bsent an Event of Default" is rendered meaningless because there could never exist an Event of

Default "prior to the end of the Term."

**LAA definition of "Events of Default."** Two of the events of default specifically occur "[d]uring the Term." (Dkt. # 75-9, Pg. ID 2054.) But if the occurrence of an Event of Default ends the Term, it cannot also occur "during" the Term. Additionally, under such an interpretation, the initial provision allegedly defining the Term as a period that ends upon the occurrence of an Event of Default would be rendered circular.

This becomes apparent if one of the enumerated Events of Default is substituted for the phrase "Event of Default" in the clause where "the Term" first appears. For instance, substituting the "material interruption" provision, it would read

> [FCA] shall provide the following accommodations to [Harvey] from the Effective Date (unless otherwise specified herein) to the earliest of (i) *a material interruption in production of any Component Part caused by Harvey during the Term*; (ii) completion of a Successful Transition (as defined below); or (iii) December 31, 2013 (the "Term").

Under FCA's interpretation the Term definition is

> The Term means the time period during which [FCA] shall provide the following accommodations to [Harvey] and runs from the Effective Date to the earliest of (i) *a material interruption in production of any Component Part caused by Harvey during the Term*; (ii) completion of a Successful Transition (as defined below); or (iii) December 31, 2013 (the "Term").

This reading is nonsensical.

**LAA provision on Additional Accommodations.** The first sentence of this section states, "Upon a Successful Transition, and as long as there has been no Event of Default, [FCA] shall permit [Harvey] to make competitive bids for the sourcing or transfer of new business." (*Id.* at 2055.) According to FCA, both "Successful Transition" and "Event of Default" define an end to the Term. Only a few sentences later, the LAA

states "[f]or clarity" that its provisions do not apply to any POs issued *after the Term*. Therefore, Harvey would not need FCA's permission to make competitive bids "[u]pon a Successful Transition" or if there had been an "Event of Default." Additionally, if the accommodations period is the Term, then the "after the Term" clarification is unnecessary. *Id.*

FCA directs the court to many of the same provisions containing "the Term" discussed above as evidence that the Term begins May 21, 2013 and runs until one of any of the three enumerated events. FCA does not quote the numerous passages in the LAA that purportedly substantiate its interpretation, but instead summarizing them in a convenient manner. (Dkt. # 78, Pg. ID 3767-68.)

FCA argues that its reading "make[s] sense given the context of the LAA." (*Id.* at 3769.) Plaintiff counters with the same argument. According to Plaintiff, the LAA makes sense only if FCA's ability to set off against the receivables was limited for the entire time during which Callidus provided funding to Harvey because the collateral for that funding was the FCA receivables. (Dkt. # 76, Pg. ID 2333.)

The parties' arguments are a wash, and immaterial. Both parties agree that the contract language is unambiguous and properly direct this court to interpret it based on solely the four corners of the document. *See Hubbell, Roth & Clark, Inc. v. Jay Dee Contractors, Inc.*, 642 N.W.2d 700, 702 (Mich. Ct. App. 2001). The court will not and cannot speculate as to the parties' various intentions or motives. *See Rory v. Continental Ins. Co.*, 703 N.W.2d 23, 26 (Mich. 2005). ("The judiciary is without authority to modify unambiguous contracts or rebalance the contractual equities struck by

contracting parties . . . ."). While "reasonable minds can differ regarding the meaning of the [Term]," *Gardner*, 753 N.W.2d at 85, as the parties have, the LAA is not "equally susceptible to more than a single meaning." *Barton-Spencer*, 892 N.W.2d at 798. The court concludes that the unambiguous language of the contract as a whole, giving "effect to every word or phrase as far as practicable," *Barton-Spencer*, 892 N.W.2d at 798, indicates that "the Term" began on May 21, 2013 and ended on December 31, 2013.

### 2. Mich. Comp. Laws § 440.2607 does not bar Defendant's setoff

Michigan has adopted UCC § 2-607, which concerns a buyer's notice of breach to a seller upon acceptance of tender of goods. Mich. Comp. Laws § 400. 2607 mirrors the UCC and states in relevant part:

(1) The buyer must pay at the contract rate for any goods accepted.

(2) Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by this article for nonconformity.

(3) Where a tender has been accepted

(a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; and

(b) if the claim is one for infringement or the like (subsection (3) of section 2312)1 and the buyer is sued as a result of such a breach he must so notify the seller within a reasonable time after he receives notice of the litigation or be barred from any remedy over for liability established by the litigation.

(4) The burden is on the buyer to establish any breach with respect to the goods accepted.

Michigan law defines various UCC terms as follows:

(2) **Conforming goods or conduct**. Goods or conduct including any part of a performance are "conforming" or conform to the contract when they are in accordance with the obligations under the contract.

(3) **Termination**. "Termination" occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach. On "termination" all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives.

(4) **Cancellation**. "Cancellation" occurs when either party puts an end to the contract for breach by the other and its effect is the same as that of "termination" except that the cancelling party also retains any remedy for breach of the whole contract or any unperformed balance.

Mich. Comp. Laws Ann. § 440.2106 (emphasis in original). Regarding termination, the law states,

(3) Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable.

Mich. Comp. Laws Ann. § 440.2309. Regarding the ability of parties to eliminate or modify UCC requirements in their contracts (known as "to contract around" a requirement), Michigan law states:

(1) Except as otherwise provided in subsection (2) or elsewhere in this act, the effect of any provision of this act may be varied by agreement.

(2) The obligations of good faith, diligence, reasonableness, and care prescribed by this act may not be disclaimed by agreement. The parties, by agreement, may determine the standards by which the performance of those obligations is to be measured if those standards are not manifestly unreasonable. Whenever this act requires an action to be taken within a

reasonable time, a time that is not manifestly unreasonable may be fixed
by agreement.

(3) The presence in certain provisions of this act of the phrase "unless
otherwise agreed", or words of similar import, does not imply that the
effect of other provisions may not be varied by agreement under this
section.

Mich. Comp. Laws Ann. § 440.1302. The LAA contains three notice provisions; it is

undisputed that none of them require FCA to notify Harvey or Callidus of an Event of

Default.

Relying on Mich. Comp Laws § 400. 2607(3)(a), Plaintiff argues that Defendant

has forfeited its right to "any remedy" by failing to timely notify either Harvey or Callidus

of Harvey's alleged Event of Default. Defendant's response is three-fold: (1) Section

2607(3)(a) is inapplicable because the parties executed an express contract containing

clear notice provisions; (2) Section 2607(3)(a) governs only breaches regarding the

tender of goods and is inapplicable to general contractual breaches such as the one

Harvey committed here; and (3) even if Section 2607(3)(a) applied, FCA gave

reasonable notice to Harvey of any nonconforming goods and Section 2607(3)(a) does

not bar FCA's claims for nondelivery of goods or cover of goods.

### a. Ability to contract around Section 2607(3)(a)'s notice provision

The Michigan UCC states that "the effect of any provision of this act may be

varied by agreement" except that "[t]he obligations of good faith, diligence,

reasonableness, and care prescribed by this act may not be disclaimed by agreement."

Mich. Comp. Laws Ann. § 440.1302(1-2). While recognizing that neither Section

2607(3)(a) nor notice is referenced, Plaintiff argues that the requirement of notice of

breach regarding tendered goods cannot be "varied by agreement" because it is an obligation of good faith or reasonableness. The court is unconvinced.

The court has allowed parties to contract around other notice provisions in the UCC. *See Magid Glove & Mfg. Safety Co., LLC v. Tower Int'l, Inc.*, No. 11-11791, 2012 WL 5821814, at *7 (E.D. Mich. May 1, 2012). For example, Section 2717(2) of the Michigan UCC requires a buyer to provide a seller notice before he sets off damages against the price he owes to a seller. Mich. Comp. Laws Ann. § 440.2717(2). In *Magid Glove,* this court did not enforce Section 2717(2)'s setoff notice requirement against the parties when they excluded it from their written contract. *See Magid Glove*, 2012 WL 5821814, at *7. Likewise, this court is inclined to conclude that the parties are not bound by Section 2607(3)(a)'s notice requirement when they exclude it from their written contract.

Moreover, the lack of notice for which Plaintiff truly complains is FCA's failure to inform Harvey that it intended to set off its damages beginning October 7, 2013. But the LAA contains no such notice requirement, at least not for the "Allowed Setoffs" at issue here. And as *Magid Glove* rightly concluded, a contract is not required to contain a setoff notice requirement.

Given Section 1302(1) of the Michigan UCC and Michigan's respect for the rights of freely contracting parties as well as its preference to avoid disturbing unambiguous contractual language, the court is strongly inclined to conclude that parties could contract around Section 2607(3)(a)'s notice requirement. *See* Mich. Comp. Laws § 440.1302(a) cmt. 1 ("Subsection (a) states affirmatively at the outset that freedom of

25

contract is a principle of the Uniform Commercial Code: 'the effect' of its provisions may be varied by 'agreement.'); *see also Rory*, 703 N.W.2d at 26 ("The judiciary is without authority to modify unambiguous contracts or rebalance the contractual equities struck by contracting parties . . . ."). Nevertheless, the court finds Plaintiff's argument for summary judgment pursuant to Section 2607(3)(a) unpersuasive for other reasons as well.

**b. Section 2607(3)(a) bars any remedy for damages arising out of a breach**

There is a paucity of law from Michigan courts concerning the notice requirement of Section 2607(3)(a). Of those cases that do implicate the provision, most address only when the timing of notice is reasonable. *See e.g., Gorman v. Am. Honda Motor Co.*, 839 N.W.2d 223 (Mich. Ct. App. 2013); *Bev Smith, Inc. v. Atwell*, 836 N.W.2d 872 (Mich. Ct. App. 2013). However, both parties point out, and the court finds helpful, an opinion issued by this court regarding a factually similar case interpreting Section 2607(3)(a)'s notice provision.

In *Contech Casting, LLC v. ZF Steering Sys., LLC*, the plaintiff buyer sued the defendant automotive parts supplier alleging breach of contract for its failure to pay for certain parts and sought a preliminary injunction. 931 F. Supp. 2d 809, 815 (E.D. Mich. 2013)( Goldsmith,J.). In addressing the preliminary injunction request, the court assessed the plaintiff's likelihood of success on the merits of its breach of contract claim. *Id.* at 814. With respect to the breach of contract claim, the defendant argued that it did not pay the plaintiff because it was entitled to set off its damages "arising out of the BMW recall" and arising out of "other alleged breaches" dating years back against the

receivables it owed to the plaintiff. *Id.* at 815. The court concluded that the defendant could not offset damages arising from the BMW recall: it had waived its right to do so by expressly telling the plaintiff it would not do so. *Id.* The court further concluded that it could not set off "damages arising out of" the early breaches because it never gave the plaintiff any notice of these breaches; it gave notice of only the breach arising out of the BMW recall. *Id.* at 816. *Contech Casting* makes clear that a buyer, upon acceptance of a tender of goods, must give notice with respect to each breach by the seller, else it cannot obtain any remedy for "damages arising out of" that breach.

It may be that FCA's notice regarding Harvey's October 7, 2013 breach was tardy and perhaps FCA is now barred from seeking any damages "arising out of" that breach. But such determination is immaterial because FCA does not seek any remedy for Harvey's alleged October 7, 2013 breach. Rather FCA cites the breach as an Event of Default under the LAA, which triggered other provisions of the LAA. These triggered provisions in turn allegedly negated the contractual restrictions on FCA's ability to set off damages for earlier breaches—breaches for which FCA already gave notice, as explained below.

Plaintiff's argument equally fails with respect to the breaches for which FCA is seeking to set off damages. Those breaches can be categorized into three groups.

First, FCA seeks to set off damages based on breaches that occurred before or during the LAA. FCA went beyond giving Harvey notice of these breaches. It insisted that they were explicitly referenced and incorporated into the LAA:

[FCA] asserts that, pursuant to the Purchase Orders, as of Effective Date,

> [FCA] has the right to setoff its accounts owed to [Harvey] for the
> expenditures, damages and claims identified in Schedule 1.a (collectively,
> the "Claim Categories"). [FCA] further asserts that the expenditures,
> damages and claims identified in the Claim Categories will be ongoing and
> will increase during the Term. The amount of the expenditures, damages
> and claims in the Claim Categories claimed to have been incurred by
> [FCA] in the aggregate at any time prior to or during the Term is referred
> to herein collectively as the "Chrysler Claim."

(Dkt. # 75-9, Pg. ID 2042.) FCA then negotiated specific conditions governing its ability to use these breaches and their related damages to set off against the receivables. These conditions were included in the LAA. (*Id.* at 2043.)

Second, FCA seeks to set off damages based on breaches for Harvey's tender of untimely goods which resulted in expedited shipping charges, and Harvey's tender of nonconforming goods which resulted in inspection and cleaning charges. (*See* Dkt. # 77-112; 77-113.) Callidus does not dispute that FCA provided Harvey timely notice of these breaches and the damages arising thereunder. (Dkt. # 78, Pg. ID at 3782.)

Third, FCA seeks to set off damages based on breaches for Harvey's nondelivery of goods. Defendant properly notes that Section 2607(3)(a)'s notice requirement applies only to the tender of goods, and that it has no application to the nondelivery of goods. *See Sta-Rite Indus., LLC v. Franklin Elec. Co.*, 519 F. App'x 370, 377 (6th Cir. 2013) ("Because the Non–Units that were never ordered were also never "tendered," the language of § 2–607(3)(a) is not applicable.") (interpreting an identical UCC notice provision in an Indiana case).

Plaintiff has not identified a breach regarding the tender of goods for which FCA (1) did not give notice, and (2) now seeks damages arising out of that breach.

**c. Section 2607(3)(a) bars any remedy for breaches regarding a tender of goods**

The vast majority of FCA's claimed damages arose prior to October 7, 2013. Section 2607(3)(a) begins by stating, "[w]here *a* tender has been accepted" the buyer must notify the seller of any breaches. (emphasis added). Reasonably read, the noticed breaches must be related to or arise out of the tender of the instant goods. Such reading is confirmed by the Sixth Circuit's holding in *Johnson Controls, Inc. v. Jay Indus., Inc.*, 459 F.3d 717 (6th Cir. 2006).

The buyer in *Johnson Controls* alleged that the seller breached the parties' contract by overcharging it. The court first recognized that Michigan has construed "any remedy" under Section 2607(3)(a) broadly, but nonetheless concluded that the buyer could recover for overcharges in subsequent installments of goods because "each overcharge was a distinct breach and [buyer] was not required to give notice prior to the occurrence of the breach." *Id.* 724–25. Here, to bar FCA from claiming damages for breaches that occurred before the October 7, 2013 alleged Event of Default, would be to require FCA to have given notice "prior to the occurrence of the breach." *Id.* Plaintiff has not explained why FCA's failure to give reasonable notice of an October 7, 2013 breach bars FCA from claiming damages arising out of breaches that occurred before October 7, 2013 and hence before FCA's notice obligation arose.

In sum, FCA's failure to provide Callidus or Harvey notice that it considered the October 7, 2013 events to be an Event of Default under the LAA until November 17, 2013 does not prohibit FCA from setting off damages in accordance with the LAA.

**3. FCA is not precluded from claiming the cost of replacement tooling**

Plaintiff next asserts that it is entitled to summary judgment on Defendant's setoff claims for replacement tooling. Replacement tooling is distinct from "Tooling" as it is defined and used in the LAA. Tooling refers to the tools that were used in connection with Harvey's manufacture, assembly, or transportation of component parts for FCA. (Dkt. # 75-9, Pg. ID 2051.) Replacement tooling refers to tooling orders that FCA placed with alternative suppliers to get production of its parts from those suppliers when Harvey failed to meet performance obligations under the POs.

Plaintiff argues that damages for replacement tooling cannot be claimed because they were not "contemplated by the parties or reasonably foreseeable by the breaching party" at the time the LAA was executed. (Dkt. # 76, Pg. ID 2362) (citing *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng. Rep. 145 (1854)). Defendant correctly points out that the *Hadley* standard concerns consequential damages and is not relevant to the Michigan's UCC's provisions providing for incidental damages, which state,

> Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, *any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.*

Mich. Comp. Laws 440.2715(1) (emphasis added). Regarding "cover" the statute states,

> (1) After a breach within the preceding section the buyer may "cover" by making in good faith and without unreasonable delay *any reasonable purchase of or contract to purchase goods in substitution for those due from the seller*.

> (2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (section

30

2715), but less expenses saved in consequence of the seller's breach. Mich. Comp. Laws Ann. § 440.2712. FCA claims that because Harvey did not deliver parts on time, FCA was forced to purchase alternative tooling. Plaintiff has not shown the absence of a genuine question of fact regarding whether the replacement tooling was a "purchase [of] goods in substitution for those due from," Harvey; therefore, FCA is not precluded from presenting such a claim.

In any event, Defendant explains that it is not claiming replacement tooling as damages for Harvey's October 7, 2013 Event of Default. Rather, and as Plaintiff emphasizes, the replacement tooling is a damages claim that arose prior to the execution of the LAA, for Harvey's breach of the POs. FCA preserved that damages claim within the LAA and agreed not to use that claim for setoff against accounts arising during the Term of the LAA. Now that the Term has ended (under any definition), FCA seeks to set off these previously acquired damages. Whether FCA will be successful in its damages claim given that FCA has also claimed it is entitled to keep the original tooling without paying Harvey for it, remains to be seen; but Plaintiff has not shown that FCA is precluded from claiming the replacement tooling as damages under the law.

There remains an additional question: whether the LAA allows FCA to set off replacement tooling damages. "Limitations of Setoffs" are an FCA accommodation that ended when the accommodations period ended, i.e., the alleged occurrence of an Event of Default on October, 7, 2013. However, while FCA may be able to begin setting off damages after October 7, 2013, against which accounts they may so do is a different matter. With a few exceptions, the LAA unambiguously prohibits FCA from setting off

damages against any payable accounts arising during the Term, i.e. before December 31, 2013. Whether FCA may set off replacement tooling damages against any of the accounts it owes to Harvey depends on which "accounts [are] payable to [Harvey] arising from the delivery of Component Parts owing as of the Effective Date during the Term in accordance with the applicable Purchase Order terms . . . ." and whether the replacement tooling qualifies as a "Material" or "Allowed" set-off. (Dkt. # 75-9, Pg. ID 2043.)  The parties do not address these issues. Plaintiff's motion for summary judgment will be denied.

### 4. Plaintiff's complaint does not contain a security interest priority claim

Article 9 of the Michigan UCC establishes the priority among conflicting security interests in the same collateral and states in relevant part,

> (1) Except as otherwise provided in this section, priority among conflicting security interests and agricultural liens in the same collateral is determined according to the following rules:

> (a) Conflicting perfected security interests and agricultural liens rank according to priority in time of filing or perfection. Priority dates from the earlier of the time a filing covering the collateral is first made or the security interest or agricultural lien is first perfected, if there is no period thereafter when there is neither filing nor perfection.

Mich. Comp. Laws Ann. § 440.9322. However, Article 9 of the Michigan UCC limits its applicability by stating:

> (4) This article does not apply to any of the following:

> (j) A right of recoupment of set-off, but [Mich. Comp. Laws § 440.9340] applies with respect to the effectiveness of rights of recoupment or set-off against deposit accounts and [Mich. Comp. Laws § 440.9404] applies with respect to defenses or claims of an account debtor.

Mich. Comp. Laws Ann. § 440.9109. Therefore, the only section of Article 9 applicable to an account debtor's right to set off is Section 9404, which states,

> (1) Unless an account debtor has made an enforceable agreement not to assert defenses or claims, and subject to subsections (2) through (5), the rights of an assignee are subject to all of the following:
>
> (a) All terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract.
>
> (b) Any other defense or claim of the account debtor against the assignor that accrues before the account debtor receives a notification of the assignment authenticated by the assignor or the assignee.

Mich. Comp. Laws Ann. § 440.9404. Plaintiff argues that FCA is a security interest holder and not an account debtor. Plaintiff also argues that it is not an assignee. Consequently, Plaintiff argues that Section 9322 should apply to the parties' dispute and because its perfected security interest in Harvey's accounts was first in time, Plaintiff's interest takes priority over FCA's interest.

The court is skeptical of the merit of Plaintiff's claim, but need not address it as the claim has been raised for the first time in Plaintiff's motion for summary judgment. A complaint must give a defendant fair notice of the plaintiff's claims and the grounds upon which they rest. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiff's complaint makes numerous mentions of Defendant's setoffs against Harvey's accounts and alleges that they are unfair, unreasonable, and in breach of the parties' contract for numerous reasons. (Dkt. # 50, 3301-31.) Absent from those reasons is any mention of security interest priority or the Michigan UCC. None of Plaintiff's claims—Breach of Contract, Declaratory Judgment, Unjust Enrichment, Promissory Estoppel—can be said

to encompass an argument that Plaintiff and Defendant hold competing security interests and that the UCC dictates that Plaintiff's interest takes priority. *See Carter v. Ford Motor Co.*, 561 F.3d 562, 569 (6th Cir. 2009) (holding that the district court properly granted summary judgment to the defendant where the record reflected that neither party understood the plaintiff's complaint to contain her new claim raised at the summary judgment stage).

Plaintiff springs this new claim at the eleventh hour. And there is no reason immediately apparent to the court why it has done so. This claim could have been raised, at minimum, in Plaintiff's amended complaint. The basis for this claim is not one that would readily appear to be dependent upon discovery or newly arisen facts. The court cannot grant summary judgment on a claim that does not exist in Plaintiff's complaint.

### C. Defendants' Motion for Summary Judgment

In claiming entitlement to partial or full summary judgment, Defendant FCA makes four arguments. First, FCA asserts that Plaintiff's claims for Breach of Contract and a Declaratory Judgment are barred by the LAA because FCA was entitled to set off damages against the receivables owed to Harvey after the Term of the LAA. Second, Plaintiff's claims for unjust enrichment and promissory estoppel are barred because the LAA is an express contract governing the same subject-matter. Third, to the extent the court disagrees with Defendant's second argument, Plaintiff's promissory estoppel claim still fails because there was no definite promise upon which Plaintiff could have been reasonable in relying. Fourth, Plaintiff is not entitled to reimbursement for Harvey's tooling costs under the terms of the LAA. (Dkt. # 78, Pg. ID 3808.)

**1. FCA's ability to set off damages**

Defendant FCA advances the same argument as Plaintiff regarding FCA's ability to set off damages against the receivable it owes to Harvey, but proposes a different interpretation of "the Term" of the LAA—one that would allow it to a setoff against accounts arising during the relevant time period. As discussed above in Section III.B(1), the court concludes that Defendant has misinterpreted the LAA. "[T]he Term" as used in the LAA began on May 21, 2013 and ended on December 31, 2013. The court will deny Defendant's motion.

**2. The existence of the LAA bars Plaintiff's claims for unjust enrichment and promissory estoppel**

Defendant argues that Michigan law prohibits a party from advancing claims based on quasi-contractual theories such as Unjust Enrichment and Promissory Estoppel when an express contract governs the same subject-matter. (Dkt. # 78, Pg. ID 3813.) Plaintiff neither contests this point nor responds at all to Defendant's argument as it relates to promissory estoppel. In response to Defendant's argument as it relates to unjust enrichment, Plaintiff asserts only that it is entitled to plead an unjust enrichment claim for the period after October 7, 2013 if this court determines that the LAA ended on that date. (Dkt. # 83, Pg. ID 4379.) In such instance, there would be no express contract governing the subject-matter at issue during that period and thus, a "pleading in the alternative is appropriate." (Dkt. # 83, Pg. ID 4381.) Given that this court will hold that the Term of the LAA continued until December 31, 2013, Plaintiff's alternative claim is moot. The court will grant Defendant's motion for summary judgment as to Plaintiff's

Unjust Enrichment and Promissory Estoppel claims (Counts III and IV of the amended complaint).

### 3. Promissory Estoppel: no definite promise

Since the court will rule in favor of Defendant on Plaintiff's Promissory Estoppel claim based on the existence of an express contract governing the same subject-matter and Plaintiff's failure to respond to Defendant's motion, Defendant's alternative argument for summary judgment on that claim is moot and the court need not address it.

### 4. Plaintiff cannot claim reimbursement for Harvey's tooling costs

The LAA requires FCA to pay Harvey for "all accounts payable to [Harvey] arising from the delivery of Component Parts owing as of the Effective Date and arising during the Term in accordance with applicable Purchase Order terms and without setoff, recoupment or other deduction of any kind, except for, in each case, to the extent, on the terms and subject to the limitations  . . . ." (Dkt. # 75-9, Pg. ID 2042.)[1] Based on this provision, Plaintiff seeks payment for Harvey's tooling costs. FCA agrees that the "accounts payable" include "payables [to Harvey] for 'tooling' as well as production parts." (Dkt. # 78, Pg. ID 3822.) However, FCA contends that the LAA does not require it to pay Harvey's tooling costs for three reasons: (1) the costs did not arise during the

---

[1] Among the exceptions to the prohibition on FCA's ability to set off damages against accounts owed to Harvey is one for "Tooling setoffs." But the LAA defines tooling setoffs as payments FCA made to a third-party tooling vendor who held a valid lien on the FCA tooling ordered by Harvey. The tooling setoff exception does not include payables FCA owes to Harvey for unpaid tooling.

Term of the LAA; (2) Harvey failed to comply with the relevant LAA requirements to be entitled to payment; and (3) Plaintiff has no competent proof of tooling damages. (*Id.*)

### a. FCA is responsible for accounts payable arising during the Term

Once again, FCA's argument is based on its now-rejected position that the Term of the LAA ended on October 7, 2013. FCA asserts that because no tooling accounts arose prior to that date, it does not owe any tooling payments. In contrast, the LAA requires FCA to pay Harvey for tooling accounts owing as of the Effective Date and arising during the Term, i.e., from May 21, 2013 until December 31, 2013. However, FCA resurrects its argument in a footnote stating "[N]o tooling accounts payable arose on or before December 31, 2013. Therefore, Callidus' Tooling claim is barred even if the LAA Term ended on this date." (Dkt. # 78, Pg. ID 3823, n. 245.)

Plaintiff responds that FCA's argument begs the question. Undisputedly, tooling was already in place prior to execution of LAA because Harvey had already begun production of FCA parts. (*See* Dkt. # 79-24, Pg. ID 4122.) Therefore, many, if not all, of the tooling accounts were "owing as of the Effective Date" of the LAA. The question is more accurately stated as whether they were "accounts payable . . . owing as of the Effective Date" or "arising during the Term." (Dkt. # 75-9, Pg. ID 2043.)

FCA asserts in a conclusory fashion that no accounts arose during the Term. (Dkt. # 78, Pg. ID 3823.) According to Plaintiff, FCA states that no tooling accounts arose during the Term because FCA has deemed an account "arisen" only if Harvey met the LAA requirements to be entitled to payment for that account. (*See* Dkt. # 79-24, Pg. ID 4124; Dkt. # 83, Pg. ID 4383.) FCA contends that Harvey did not meet the

requirements for any of the accounts to become payable, let alone payable during the

Term. FCA's conclusion that no accounts arose during the Term is premised on

acceptance of its assumption that Harvey did not meet the LAA requirements for any

account to be payable—an assumption that FCA presents as a "separate reason" that it

entitled to summary judgment, regardless of whether accounts arose during the Term.

(Dkt. # 78, Pg. ID 3823.) Hence, FCA's entire first argument regarding the tooling

payments misleadingly begs the question.[2]

### b. Harvey has not complied with the requirements for payment

The starting premise under the LAA is that FCA is required to pay Harvey for

tooling "to the extent, on the terms and subject to the limitations" in the LAA. (Dkt. # 75-

9, Pg. ID 2043.) The LAA has several provisions regarding payment for tooling, one of

which establishes certain requirements Harvey must fulfill to be entitled to payment for

tooling:

> Unpaid Tooling Payments. Prior to [FCA] making any payment to [Harvey]
> with respect to Unpaid Tooling, [Harvey] shall either (a) provide [FCA]
> confirmation that all payments due from [Harvey] to its tool vendor(s) for
> such Unpaid Tooling have been paid in full and obtain a lien release from
> such tool vendor(s) relating to the Unpaid Tooling or (b) agree that [FCA]
> may pay [Harvey]'s tool vendor(s) directly for any amounts due from
> [Harvey] to such tool vendor(s) for the Unpaid Tooling and subject to
> Section 1(c), exercise a Tooling Setoff by such amount.

---

[2] While FCA's argument is not meritless, the court is perturbed by FCA's representation
to the court that it is entitled to summary judgment on the tooling account claims "for
three independent reasons." (Dkt. # 78, Pg. ID 3822.) When one's first argument is
*entirely* reliant and conditioned upon the acceptance of one's second argument, then his
first argument is not an independent or separate logical (or legal) basis for summary
judgment.

(Dkt. # 75-9, Pg. ID 2052.) The LAA defines tooling that has not been paid for by FCA as follows:

> "Unpaid Tooling" means Tooling for which [FCA] has issued a purchase order and has not paid the applicable purchase order price for such Tooling to [Harvey]. Until payment in full by [FCA] of the applicable purchase order price for any item of Unpaid Tooling, [FCA] shall not have the right to take possession of the same. Upon payment in full of the applicable purchase order price for any Unpaid Tooling, such tooling shall be deemed to be Customer Tooling. [Harvey] asserts that the tooling listed on Schedule 2(e)(iii) is Unpaid Tooling.

(*Id.* at 2051-52.) Defendant alleges that Harvey failed to comply with option (a) for "Unpaid Tooling Payment" because it never "provide[d] [FCA] confirmation that all payments due from [Harvey] to its tool vendor(s) for such Unpaid Tooling have been paid in full [nor] obtain[ed] a lien release from such tool vendor(s) relating to the Unpaid Tooling" as is required under the LAA to trigger FCA's obligation to pay for unpaid tooling. (*Id.* at 2052.) In Plaintiff's answers to Defendant's requests to admit regarding whether Harvey or Callidus had met either of the applicable requirements in the LAA to be entitled to payment for unpaid tooling under option (a)—confirmation that the payments to the vendor were made in full and a full lien release—Plaintiff responded:

> Callidus lacks knowledge and information to truthfully admit or deny whether Harvey provided [FCA] confirmation that all payments due from Harvey to [vendor] for the tooling covered by [FCA's POs] have been paid in full . . . Callidus admits that it has not [done so.]
> . . .
> Callidus lacks knowledge and information to truthfully admit or deny whether Harvey obtained a full lien release from [vendor] for the tooling covered by [FCA's POs] . . . Callidus admits that it has not [done so.]

(*See* Dkt. # 77-109, Pg. ID 3496-3540.)

Plaintiff counters, without quotation or citation, that FCA's representative testified

39

in his deposition that "it had been confirmed to [FCA] that all tooling vendors had been paid." (Dkt. # 83, Pg. ID 4390.) Even assuming this allegation is true (although the court must remain skeptical given the record), Plaintiff has offered no evidence that Harvey "obtained a lien release" from each of the vendors. (Dkt. # 75-9, Pg. ID 2052.) Plaintiff asserts only that FCA's representative was "unaware of any unpaid tooling vendors that could assert a lien on the tooling." (Dkt. # 83, Pg. ID 4389.) The FCA representative's lack of knowledge is insufficient to demonstrate Harvey's compliance with the contractual obligations under the LAA.

Plaintiff argues that whether Harvey met the option (a) requirements is immaterial because Harvey also complied with option (b), which states that "[p]rior to [FCA] making any payment to [Harvey] with respect to Unpaid Tooling, [Harvey] shall . . . (b) agree that [FCA] may pay [Harvey]'s tool vendor(s) directly for any amounts due from [Harvey] to such tool vendor(s) for the Unpaid Tooling and subject to Section 1(c), exercise a Tooling Setoff by such amount." (Dkt. # 75-9, Pg. ID 2052.) Plaintiff avers, once again lacking quotation or citation, that "Harvey consented to the direct payment of its tooling vendors." (Dkt. # 83, Pg. ID 4389.) Even assuming the truth of this allegation, Plaintiff does not assert that FCA failed to pay the third-party vendors, and as Defendant points out, Plaintiff does not request that FCA pay any tooling vendors directly. Instead, Plaintiff contends that FCA's "payments to the third parties triggered the obligation to pay the Unpaid Tooling" generally. (Dkt. # 83, Pg. ID 4388, n. 18.)

Plaintiff's proposed interpretation of the LAA renders the word "any" superfluous. The LAA states that the requirements for Unpaid Tooling Payments must be met "[p]rior

to [FCA] making *any* payment to [Harvey] with respect to Unpaid Tooling." (Dkt. # 75-9, Pg. ID 2052) (emphasis added). They are not one-time occurrences. They must be met for every payment due under every purchase order to every vendor. Moreover, this reading of option (b) comports with option (a). The release of a lien on tooling provided by one vendor would not be reasonably understood to extinguish the requirement that Harvey obtain releases of liens from all the other vendors prior to FCA making payment to Harvey with respect to the tooling provided by the other vendors. Plaintiff has failed to identify a tooling account for which Harvey met option (b) of the Unpaid Tooling Payment requirements *and* the third-party vendor was not properly paid by FCA.

Plaintiff argues that FCA's "position is essentially that even though it used over ten million dollars' worth of parts Harvey manufactured with the tools in thousands of its cars, it does not need to pay for the tools because the paperwork was not complete." (Dkt. # 83, Pg. ID 4385.) The "paperwork" to which Plaintiff refers is a part of the parties' written contract. The parties freely bargained for specific obligations and procedures including "paperwork." Plaintiff's argument here sounds in equity, and is unavailing in the context of an unambiguous written contract. *See Universal Underwriters Ins. Co.*, 628 N.W.2d at 494 ("Absent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement."). The LAA clearly states that "[p]rior to [FCA] making any payments to [Harvey] with respect to Unpaid Tooling" Harvey must meet one of two requirements. (Dkt. # 75-9, Pg. ID 2052.) Plaintiff has provided no evidence indicating that Harvey met one of the requirements for an unpaid tooling PO and FCA then failed to fulfill its related obligations. Plaintiff has

failed to identify a genuine question of material fact as to its right to recover for the unpaid tooling. The court will grant Defendant's motion for partial summary judgment.

### c. Tooling Damages

Since the court will rule in favor of Defendant on Plaintiff's claim regarding the unpaid tooling accounts based on the contractual requirements of the LAA, Defendant's alternative argument for summary judgment on that claim is moot and the court need not address it.

### IV. CONCLUSION[3]

Michigan's contract law rules of interpretation support Plaintiff's understanding of "the Term" as that phrase is used in the parties' contract. Plaintiff correctly concludes that "the Term" is distinct from the accommodations period, which began May 21, 2013 and ended at the occurrence of any one of three alternative events. The court concludes that "the Term" began May 21, 2013 and ended December 31, 2013, and will grant Plaintiff's motion in that regard. As a result, the court will deny Defendant's related motion advancing the interpretation of "the Term" rejected by the court.

However, Plaintiff has incorrectly argued that Mich. Comp. Laws § 440.2607(3) bars Defendant from seeking to set off certain damages arising out of Harvey's

---

[3] Plaintiff's counsel has repeatedly telephoned the court regarding the status of its motion. These calls have neither aided the court in its disposition of the motion nor expedited the review process in this highly complex case. If anything, the court's staff has spent needless time conveying to Plaintiff's counsel's office that the motion remains under consideration, along with the court's many other motions, and will be decided in due time. The court can only imagine how little would be accomplished if counsel on every case telephoned the court regarding the resolution of his motions.

breaches of the parties' POs and the LAA. Similarly, Plaintiff has failed to show a genuine question of material fact regarding whether Defendant is entitled to claim damages for the replacement tooling. Lastly, Plaintiff has sought summary judgment on a claim not pled in its complaint. Plaintiff's motion for summary judgment will be denied with respect to these arguments.

Plaintiff does not dispute Defendant's assertion that quasi-contractual claims cannot be maintained when an express contract governs the same subject-matter for the same time-period. The court will grant Defendant's motion for summary judgment on Plaintiff's Unjust Enrichment and Promissory Estoppel claims. Plaintiff has failed to identify a genuine question of fact concerning Harvey's compliance with the contractual requirements to receive payment for unpaid tooling. Therefore, court will also grant Defendant's motion for summary judgment on Plaintiff's claims for unpaid tooling.

Accordingly,

IT IS ORDERED that Plaintiff's Motion for Summary Judgment (Dkt. # 76) is GRANTED in part and DENIED in part as further specified above.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment (Dkt. # 78) is GRANTED in part and DENIED in part. It is GRANTED at to Counts III and IV of Plaintiff's Amended Complaint (Dkt. # 50). It is DENIED in all other respects.

IT IS FURTHER ORDERED that the parties are DIRECTED to meet and confer regarding the status of this case, after which, the parties are FURTHER DIRECTED to report the status to the court **during a telephonic conference on Thursday, April 19, 2018 at 11:00 am.** Specifically, the court will be interested to know whether the parties

would like to renew settlement negotiations, and if so, whether they would like to use to same facilitator. Otherwise, the case will proceed to trial and the parties should report how much time they anticipate they will need for trial preparations as well as for trial.

s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  March 30, 2018

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 30, 2018, by electronic and/or ordinary mail.

s/Lisa Wagner
Case Manager and Deputy Clerk
(810) 292-6522